PIERRE EMMANUEL, Baron De Laurens D'Oiseley,

*v.*

PEOPLE OF PORTO RICO.

---

San Juan, Law, No. 574.

In the year 1900, plaintiff, a citizen of France, was the owner of about 4,000 cuerdas of land in Porto Rico. In that year the insular government through its then treasurer, not believing that plaintiff's title was good, caused his tenants to register the property in their own names and to also return their several parcels for taxation in their individual names. Plaintiff then came to Porto Rico and objected to this action of the insular government. After considerable trouble he was advised by the insular officials to file a suit against the treasurer or the people of Porto Rico, to quiet his title, which he did. After years of hard-fought litigation, which the insular authorities vigorously defended, even to the supreme court of the

Emmanuel v. People.

island, he finally recovered his land. Then he sued the insular gov-
ernment for the losses in the way of rents and profits which had
accrued to him in the meantime. Held: That it was too late under
all the circumstances, for the insular government to withdraw its
consent to be sued, and that he could recover, but the matter as to
how the judgment should be paid is left to the future action of the
insular legislative assembly or of Congress.

Opinion filed September 7, 1909.

*Messrs. Federico Degetau, Bonifacio Sanchez,* and *Rafael Lopez Landron,* attorneys for plaintiff.

*The Attorney General of the Island,* for the defendant.

RODEY, Judge, delivered the following opinion:

This is an extraordinary sort of a case. It is a suit brought
by the plaintiff to recover damages from the People of Porto
Rico for having, as he claims, deprived him of the use of a
little over 4,000 cuerdas of land, of which he was the owner,
situated near Lares on this island, for a period of about five
years from 1900 to 1905. The suit was originally filed in this
court in July, 1908. A demurrer was interposed and at first
we felt very much inclined to sustain it, but finally concluded,
for the reasons stated in a memorandum sent to the files under
date of February 16th, 1909, to take all the proofs, as the parties
had stipulated that it should be tried before the court without a
jury, so that we might, if possible, ascertain the real merits of
the case by having the whole matter before us.

In June, 1909, the trial was had, and the evidence was fully

Emmanuel v. People.

submitted by both sides. Thereafter the case was argued at length orally by counsel for the respective parties, and they supplemented this by painstakingly written arguments and briefs.

The facts of the case briefly stated are about as follows:

In the year 1900, shortly after American occupation of Porto Rico, one J. H. Hollander, who it appears was at that time the treasurer of the island, for some reason or other came to the conclusion that this tract of land out near Lares did not belong to the plaintiff, who claimed to have inherited it from the Duchess of Mahon Crillon, of France, and he, the treasurer, therefore, caused all the tenants living on the land to be so notified, and caused the property to be registered in the registry of property as belonging to the people of Porto Rico, and had the tenants, at least as to taxes, return the same in their own individual names. Naturally, the present plaintiff, who, as stated, at this time had become the owner of the land, protested vigorously against this but without immediate result. However, in a short time he produced such evidences of title to Mr. Hollander as that the latter wrote him that he had better file a suit against the people of Porto Rico and have the matter judicially determined. The plaintiff did file such a suit in the district court at San Juan, and it was a most elaborate proceeding, wherein the Attorney General of the island and his assistants appeared against the plaintiff, but the decision was for the plaintiff. From this decision the Attorney General on the part of the people, took an appeal to the supreme court of the island, where the case was again presented and argued at great length, and finally, in June, 1904, was again decided in favor of the plaintiff,—the supreme court affirming the decision of the lower court.

See the report of the case Emmanuel v. People, 2 Porto Rico, pp. 103 et seq., where the entire history of the case, from the original grant of the land by Charles III. of Spain, in 1776, to the Duke of Mahon, is fully set forth. The grant was originally of 4 square leagues, but at the time of this controversy had, for one cause or another, become reduced to an area of about 4,100 cuerdas.

It transpired that, from the time Mr. Hollander thus arbitrarily registered the property in the name of the people of Porto Rico, to the time the plaintiff was again put in possession of the land, in the latter part of 1905, all of the tenants refused absolutely to pay the plaintiff any rent, and the entire sum was lost to him, save about something over 800 pesos, which he managed to collect after having been put to a lot of expense in bringing ejectment and other suits against many of the tenants, both before and after the decision in the supreme court of the island.

From all the evidence presented before us, which we have gone over carefully, as it has since the time of the trial all been written out from the stenographer's notes, we find the fact to be, that previous to the action of this insular official, Mr. Hollander, this property brought a rental revenue varying from 3,000 to 3,500 pesos per annum to its owner. We further find from the evidence that the hurricane of 1899 devastated that section of the country so that the land itself was not so easily rented, nor was it as productive, nor were the tenants, even had nothing occurred, in a position thereafter to rent land or pay their rent as promptly as they would have done had no such disaster befallen that section of the island. From all of the evidence we therefore find that only about 2,750 cuerdas of the land was possessed by tenants, or could have been rented to,

or paid for, by them during the five years that plaintiff was so out of possession. We further find that the reasonable rental value of this land during that period of time (1900 to 1905) is the sum of 60 cents gold per cuerda, or in all $1,650 per annum, which for the five years would make $8,250, from which is to be deducted about $800 of back rent that it is admitted was collected by the agents of plaintiff, after the decision in the supreme court, thus reducing his net loss to the sum of $7,450 gold. It is quite apparent that plaintiff sustained much greater loss than this on account of expenses of litigation, travel, counsel fees, etc., but as to this no proof was introduced and, anyway, it perhaps is matter that ought to have been settled in the suits in the insular courts.

We have devoted a good deal of time to this case because of the very able manner in which it was presented and urged by the learned counsel for the respective parties, but still we have the gravest doubts about the right of plaintiff to recover at all in this or any other court, because his remedy would ordinarily be before the legislative assembly. See Langford v. United States, 101 U. S. 341, 25 L. ed. 1010. We have these doubts for many reasons, among them being, because, as we recently held in the case of Elkins v. People, post,—, the insular government cannot be sued without its consent, and because the matter of these damages ought, perhaps, to have been settled in the suit for the recovery of the land in the insular district or supreme court, and furthermore, because it is unquestioned, we think, from the record, that the island itself never actually received any rent, profit, or usufruct from this land or any portion of it. Mechem, Pub. Off. § 849. See also New Orleans v. Gaines (New Orleans v. Christmas) 131 U. S. 191, 33 L. ed.

99, 9 Sup. Ct. Rep. 745. The injury which the government unquestionably did to plaintiff, being to deprive him of the right to the use and enjoyment of his property for about five years, because of this deliberate but unauthorized registering of the land in the name of the people of Porto Rico, and by such action inducing his tenants to thereafter refrain, desist, and refuse, as they did, from paying him his usual rentals,—surely this is a wrong for which plaintiff ought to be compensated!

If the plaintiff can legally recover, it must be, we submit, under subsec. 4 of § 1804 of the Civil Code of 1902, which provides that "the state is liable in this sense when it acts through a special agent, but not when the damage should have been caused by the official to whom properly it pertained to do the act performed, in which case the provisions of the preceding section (that is, that the party himself must respond) shall be applicable."

It is probaly true that even if Mr. Hollander was not such a special agent as is contemplated by the section just quoted, still the island as a government thoroughly and completely ratified his acts by refusing to restore his land to him, and by requesting and obliging him to bring a suit in the district court to establish his rights, and then, by defending the suit to a final judgment, even to the supreme court of the island, as vigorously as it did, and hence we think that in all fairness it is too late at this time for the island to plead or insist on its privilege of exemption from suit. We are also of the belief that under the circumstances the court ought not to hold that the claim is barred by the one-year statute of limitations, and of course no other is applicable to the facts.

We are aware that the Supreme Court of Spain, in a sentencia

Emmanuel v. People.

of May 18, 1904, 98 Jurisprudencia Civil 390, held with reference to § 1903 of the Spanish Code, which is the same as § 1803 of the Porto Rican Code, that the responsibility of the state can only occur when a special agent is particularly employed and particularly authorized to do the particular act, and not where he does an act that he is not specially authorized to do while being generally employed as an agent or employee of the government. This is its language: "Que la responsabilidad del estado se limita por el articulo 1903 al caso en que obre por mediación de un agente especial, y agente especial en el sentido en que se emplean estas palabras es el que recibe un mandato ó comisión concreta ó determinada ajena al ejercicio de su cargo si es funcionario publico, para que en representación del estado, y obligandole como mandatario suyo, cumpla el encargo que se le confie; concepto que no puede alcanzar á un agente ejecutivo, que es un empleado de la administración activa, y que bajo su responsabilidad ejerce las funciones naturales y propias de su cargo, reguladas por la ley y por los reglamentos."

But, as stated, we are constrained to think that Mr. Hollander, in fact, was a special agent for the purpose at the time; and in any event his action was ratified as pointed out.

In our opinion in the Elkins suit filed simultaneously herewith, we pointed out that to render a judgment against the island is one thing, but as to the way it should be collected or satisfied is quite another, and, as we are of opinion that providing the means of payment of a judgment in this sort of a case is entirely matter for the legislature, no execution will be permitted to issue as, of course, on the judgment we shall authorize. In fact, the rendition of any judgment in the cause is, in a sense, **rather** advisory to the legislature than anything else.

### Emmanuel v. People.

It is reasonable to suppose that had this claim been presented to the legislative assembly in the first instance it would have been paid, because the injury to the plaintiff is manifest, and he has been guilty of no wrong.

Having read all the exhibits, and gone over the record with great care, and listened to the testimony presented and the arguments of the learned counsel for the respective sides, we unhesitatingly say that the equities are entirely with the plaintiff, and that the insular authorities did cause damage to him in at least the sum of $7,450 gold, as before stated, and therefore judgment for that amount will be entered with costs, the latter to include the stenographer's fee for transcribing the testimony, but execution therein will be stayed to give the insular authorities or the legislative assembly an opportunity to act in the premises.